RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0162p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CEDRIC CARTER,

                 *Petitioner-Appellant,*

   *v.*

BETTY MITCHELL, Warden,

                 *Respondent-Appellee.*

No. 13-3996

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:98-cv-00853—Thomas M. Rose, District Judge.

Argued: April 20, 2016

Decided and Filed: July 13, 2016

Before: COLE, Chief Judge; CLAY and SUTTON, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Keith A. Yeazel, Columbus, Ohio, for Appellant. Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Keith A. Yeazel, Columbus, Ohio, for Appellant. Thomas E. Madden, Jocelyn S. Kelly, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

**OPINION**

---

CLAY, Circuit Judge. Petitioner Cedric Carter, who was convicted and sentenced to death by an Ohio jury in 1992, appeals the order of the district court denying him a writ of habeas corpus, which he had sought pursuant to 28 U.S.C. § 2254, and denying him a stay of the federal habeas proceedings. For the reasons that follow, we **AFFIRM**.

# BACKGROUND

## Factual Background

In its decision affirming Carter's conviction and sentence on direct appeal, the Ohio Supreme Court described the facts giving rise to this case as follows:

In the early morning hours of April 6, 1992, Frances Messinger was murdered while working alone as a clerk at a United Dairy Farmers convenience store ("UDF") in Cincinnati. A grand jury returned an indictment charging appellant, Cedric Carter, in two counts, with aggravated murder in violation of R.C. 2903.01(B) and aggravated robbery in violation of R.C. 2911.01 based on the events surrounding Messinger's death. The indictment included a felony-murder death specification pursuant to R.C. 2929.04(A)(7), charging Carter with causing death while committing or attempting to commit aggravated robbery, and being the principal offender in an aggravated murder, or alternatively with committing a murder with prior calculation and design. Both counts also contained gun specifications. A jury found Carter guilty as charged and recommended that he be sentenced to death. The death sentence was subsequently imposed by the trial court.

At approximately 2:15 a.m. on April 6, 1992, Carol Blum, a waitress working directly across the street from the UDF, dialed 911 and reported that she had just seen two black males running from the UDF. At trial, Blum testified that immediately prior to calling 911, she saw two men inside the UDF—one man in front of the counter with both arms extended toward the register with hands together pointing to something, and the second man behind the counter near the register. She saw the man behind the counter bend down, and then observed both men run out. The waitress did not see Messinger standing at any time while she was observing the incident. When Messinger's body was discovered shortly thereafter, an unmelted ice-cream cone was found on the floor of the UDF in the area in front of the counter near the exit doors.

On April 7 one Kenny Hill surrendered himself to authorities in connection with the Messinger murder. Based on information provided by Hill, police obtained a search warrant for an apartment at which Carter was temporarily residing. Carter was arrested in the early morning hours of April 8, 1992 during the course of the search which followed. During the search the police recovered the murder weapon, a .38 caliber Smith & Wesson five-shot revolver manufactured between 1877 and 1891, the hammer of which must be pulled back manually prior to the firing of each round.

Following his arrest, Carter was taken to police headquarters to be interviewed. At approximately 3:50 a.m. Carter signed a waiver of rights form, which recited

his rights as delineated in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. During the tape-recorded statement which followed, Carter admitted being present at the UDF during the course of the robbery, but initially identified Hill as the shooter. The police then discontinued taping the interview, and told Carter his statement was inconsistent with statements police had obtained from other witnesses. Upon resumption of the taping, Carter admitted that he was the shooter at the UDF robbery.

At trial the state and the defense agreed to many of the facts surrounding the robbery. Both parties are in accord that three men were involved: Carter, Hill (who also entered the UDF store), and Virgil Sims (who drove the car used by Carter and Hill before and after the murder). It is undisputed that Carter shot two times and that one bullet lodged in a carton of cigarettes in a cabinet behind the cash register, while the second struck Messinger in her forehead, killing her.

Carter testified at the trial and admitted involvement in the crime. Carter testified that he entered the UDF first (without a gun) and that Hill followed shortly thereafter, carrying with him the .38 caliber Smith & Wesson revolver. Carter ordered an ice cream cone, and while Messinger was standing at the cash register to accept payment for the cone, Hill passed the gun to Carter. Carter denied, however, that he had intended to kill Messinger. He testified that he had been a heavy user of crack cocaine; that he used significant amounts of alcohol, marijuana and crack cocaine during the period leading up to the murder; and that Hill was his supplier. Although Carter admitted that he entered the store with the intent to rob it, he testified that he and Hill had not talked about robbing the store until immediately prior to the robbery. He further testified that he never intended to be the one to hold the gun during the robbery. He admitted, however, that he knew the gun had bullets, and that Hill had showed him earlier in the day how to shoot it. He further admitted that before robbing the UDF the three had participated in "a lot" of robberies of drug dealers that same evening, and that only Hill had used the gun to threaten the victims in those robberies while Carter remained in the car. Carter testified that he first fired the gun at the floor to scare Messinger as she pushed the gun away and shut the register drawer. Carter testified he told Messinger to open the cash register, but she refused. He stated that Hill then suggested leaving, and that as they turned to leave, he fired a second shot when Messinger began fumbling in an apparent attempt to push an alarm button. Carter maintained consistently that he did not aim at Messinger, but instead aimed to fire a shot by her to scare her, and never intended to shoot her.

Medical testimony established that Messinger was killed as a result of a bullet wound which entered her forehead slightly left of the midline. The bullet traveled sharply left to right, and front to rear, with a slight upward angle. No stippling or gunpowder burns were found on Messinger's skin, indicating that the gun had been fired from a distance greater than one foot.

*State v. Carter*, 651 N.E.2d 965, 969–70 (Ohio 1995).

## Procedural History

**Carter's trial**

A jury in the Court of Common Pleas of Hamilton County, Ohio found Carter guilty of aggravated murder on July 11, 1992. Four days later, the jury recommended a death sentence. The trial court adopted the jury's recommendation and sentenced Carter to death on July 30, 1992.

Prior to trial, Carter was referred to specialists to determine whether he was competent to stand trial, or was not guilty by reason of insanity. The evaluations, which were sent to the prosecution as well as the defense by order of the trial court, indicated "malingering to avoid prosecution" and mentioned Carter's drug use and past abuse of women and included graphic descriptions of his cruelty to animals. (J.A. vol. 3, p. 938.) The defense requested the appointment of Dr. David Chiappone, a psychologist affiliated with the court clinic, as a mitigation expert. Dr. Chiappone's assistant, a social worker named Edward Wantuck, conducted extensive interviews with Carter's family and friends, but the summaries of these conversations (the "Wantuck reports"), were never given to the jury or introduced in any state proceeding. By the time of his mitigation presentation at the sentencing phase of the trial, Dr. Chiappone had been in contact with trial counsel for some two months, and had spent approximately five hours with Carter. Dr. Chiappone estimated that he had previously testified as a mitigation expert in six or seven capital trials.

At the sentencing phase, trial counsel called Richard Spaulding, Carter's stepfather, who had known Carter for about three years, as a mitigation witness, but did not call Carter's mother. Carter then read an unsworn statement expressing remorse. Dr. Chiappone was the final witness for the defense. On direct examination, trial counsel had Dr. Chiappone present a psychological

portrait that included some of the trauma that Carter had experienced during childhood, but also touched on his drug use, abuse of women, interest in violence, and animal cruelty. Dr. Chiappone evidently was hard to hear, at least initially. At various points early in his testimony, jurors raised their hands to signal to the court that they could not hear the witness. During deliberations, the jury requested a transcript of Dr. Chiappone's testimony, which the court denied. The jury recommended a death sentence on July 15, 1992.

**Post-trial state court proceedings**

Carter took his initial direct appeal to the Ohio Court of Appeals, which affirmed his conviction and sentence. *State v. Carter*, No. C-920604, 1993 WL 512859 (Ohio Ct. App. Nov. 3, 1993). The Ohio Supreme Court also affirmed Carter's conviction and sentence. *Carter*, 651 N.E.2d at 980. The United States Supreme Court subsequently denied certiorari. *Carter v. Ohio*, 516 U.S. 1014 (1995).

Carter filed his first state post-conviction petition in 1996, which was denied. The Ohio Court of Appeals affirmed the denial of relief, *State v. Carter*, No. C-960718, 1997 WL 705487 (Ohio Ct. App. Nov. 14, 1997), and the Ohio Supreme Court declined to hear the case because it did not raise a substantial constitutional question. *State v. Carter*, 81 Ohio St. 3d 1467 (1998). The United States Supreme Court again denied certiorari. *Carter v. Ohio*, 525 U.S. 848 (1998).

In 1999, after filing a petition in federal court for a writ of habeas corpus, Carter returned to state court to file an application to reopen his direct appeal pursuant to Ohio R. App. 26(B). The Rule 26(B) application was denied by the Ohio Court of Appeals because Carter had failed to show good cause for filing outside of the ninety-day time frame for Rule 26(B) applications. *State v. Carter*, No. C-920604, 1999 WL 33441359 (Ohio Ct. App. Oct. 21, 1999). Carter did not appeal this decision to the Ohio Supreme Court. Carter filed another 26(B) application in 2000. The Ohio Court of Appeals denied this application as well, and the Ohio Supreme Court affirmed. *State v. Carter*, 757 N.E.2d 362 (Ohio 2001).

In 2003, Carter filed another petition for post-conviction relief in Ohio state court, in which he argued that he was mentally retarded and therefore could not legally be executed under *Atkins v. Virginia*, 536 U.S. 304 (2002). The Ohio Court of Appeals reversed the trial court's

denial of this petition, and remanded for an evidentiary hearing. *State v. Carter*, 813 N.E.2d 78 (Ohio 2004). Carter voluntarily dismissed this petition in 2005.

**Federal court proceedings**

On November 12, 1998, Carter filed a fifty-count petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio. In conjunction with the federal habeas proceeding, Carter took the deposition of his trial counsel in 2000; that same year, the federal court habeas record was expanded to include the entire trial file of trial counsel Herbert Haas, including the Wantuck reports. In 2005, the district court held an evidentiary hearing at which Carter's appellate counsel testified. In 2006, the district court adopted the report and recommendation of the magistrate judge denying relief as to all remaining habeas claims and ordered Carter's habeas petition dismissed in its entirety with prejudice.

On appeal, this Court affirmed in part and reversed in part, and remanded for further proceedings. *Carter v. Mitchell*, 693 F.3d 555 (6th Cir. 2012). Over a partial dissent from Judge Sutton, the majority held that Carter's 28th and 29th grounds for relief alleging ineffective assistance of trial counsel at the penalty stage had not been procedurally defaulted:

> Carter also has not, in these two grounds for relief, expanded the scope of his claims from what he presented to the state courts. "To fairly present a claim to a state court a petitioner must assert both the *legal* and factual basis for his or her claim." *Williams*, 460 F.3d at 806; *see Clinkscale*, 375 F.3d at 437. In order to satisfy this requirement, and avoid a procedural default, the petitioner's federal habeas petition must be based on the same theory presented in state court and cannot be based on a wholly separate or distinct theory. *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). For example, in *Wong*, one of the grounds the petitioner asserted in support of her petition for habeas relief was based on allegations that she had received constitutionally ineffective assistance of counsel. *Id.* at 319. In the state court proceedings Wong had alleged only that counsel's performance was deficient for failing to pursue an insanity defense. *Id.* at 319. However, in federal court, Wong additionally alleged that counsel was constitutionally ineffective for neglecting to undertake additional investigation into whether an alternate expert might have concluded that she was legally insane. *Id.* at 321. This Court held that the portion of the claim based on not undertaking a complete investigation was procedurally defaulted because Wong had not presented it to the state courts. *Id.* at 322; *accord Williams*, 380 F.3d at 968 (holding that petitioner's claims to the state courts alleging prosecutorial misconduct in improperly vouching for the credibility of a witness were

insufficient to preserve claims based on other instances of prosecutorial misconduct).

Carter's twenty-eighth and twenty-ninth grounds for relief were fairly presented to the state courts and are not based on new or distinct theories insofar as they relate to the preparation of Carter's mitigation expert and the failure of Carter's mother to testify at his mitigation proceedings. On direct appeal to the Ohio Court of Appeals, Carter asserted in Assignment of Error X that:

> THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF DEFENDANT-APPELLANT IN ENTERING A SENTENCE OF DEATH WHEN DEFENDANT-APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE UNITED STATES CONSTITUTION, AMENDMENT VI.
>
> Issue 1. Has an accused been given effective assistance of counsel when his defense attorneys, in the penalty phase, elicit testimony from a mitigation expert when said testimony, taken as a whole, is very unfavorable to the accused?
>
> Issue 2. Has an accused been given effective assistance [of] counsel when his attorneys, lacking much in mitigatory evidence, fail to have the accused's mother testify on his behalf?

Similarly, Carter presented these issues in his direct appeal to the Ohio Supreme Court as Propositions of Law number X and XI. And, Carter raised these issues again in his petition for post-conviction review as his Sixth, Ninth, and Eleventh Causes of Action.

In his petition for habeas corpus to the federal district court, Carter's twenty-eighth ground for relief asserts that he was denied the effective assistance of counsel at the mitigation phase of his trial. The claim goes into some additional detail about the deficiencies of Dr. Chiappone's testimony and how, in Carter's view, it was caused by his failure to perform a diligent inquiry into Carter's background. Additionally, Carter also specifically raises as part of this ground for relief counsel's failure to have his mother testify. Similarly, Carter's twenty-ninth ground for relief raises the issue of counsels' [sic] ineffectiveness leading to the exclusion of evidence from the mitigation stage and, specifically, the trial court's refusal to provide the jury with a transcript of Dr. Chiappone's testimony. Therefore, because these claims were raised through a complete round of Ohio's appellate process, they are not procedurally defaulted. Because the district court erred in concluding otherwise, we remand the matter to the district court for it to consider the merits of these claims in the first instance and whether either entitles Carter to a writ of habeas corpus.

*Id.* at 568–69. The opinion concluded:

> Carter did not procedurally default his twenty-eighth or twenty-ninth grounds for relief. Therefore, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for the district court to consider whether Carter is entitled to a writ of habeas corpus based on counsel's performance at the penalty phase of trial or the trial court's exclusion of evidence at the mitigation phase.

*Id.* at 569.

The magistrate judge on remand issued a report and recommendation addressing the following claims of ineffective assistance of counsel: trial counsel's eliciting negative testimony from Dr. Chiappone; trial counsel's failure to call Carter's mother to testify; and counsel's failure to object to the trial court's refusal to give the jury a transcript of Dr. Chiappone's testimony. The magistrate judge recommended that relief be denied. Carter then moved to stay the district court proceedings and hold them in abeyance while he introduced additional evidence in state court that he had developed in federal habeas proceedings. After ordering a supplemental report and recommendation, the district court adopted this recommendation on June 10, 2013. On June 27, 2013, the district court adopted the magistrate judge's recommendation that the request for stay be denied. The district court entered its judgment and issued a certificate of appealability as to the denial of the stay and as to what it considered "the three issues remanded by the Sixth Circuit Court of Appeals":

> (1) Was Petitioner denied effective assistance of trial counsel by his attorney's eliciting unfavorable testimony from a mitigation expert during the penalty phase of his capital trial?
>
> (2) Was Petitioner denied effective assistance of trial counsel by his attorney's failure to call Petitioner's mother as a witness during the penalty phase of the trial?
>
> (3) Was Petitioner denied effective assistance of trial counsel by his attorney's failure to insist that the trial court provide the jury with a transcript of Dr. Chiappone's testimony?

(R. 186, Order at Page ID 765.) Carter timely appealed.

**DISCUSSION**

**I. Scope of the mandate**

The parties dispute the scope of the remand order from the prior panel. We therefore take this opportunity to clarify it.

**Standard of review**

We review de novo the scope of our own mandates, "taking into account the letter and spirit of the mandate." *United States v. Brika*, 487 F.3d 450, 456 (6th Cir. 2007). District courts are "bound to the scope of the remand issued by the court of appeals." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999). "The scope of a remand is determined by examining the entire order or opinion, to determine whether and how the court of appeals intended to limit a remand." *Scott v. Churchill*, 377 F.3d 565, 570 (6th Cir. 2004).

"[W]hen confronted with a remanded case," a district court must "determin[e] what part of this court's mandate is intended to define the scope of any subsequent proceedings. The relevant language could appear anywhere in an opinion or order, including a designated paragraph or section, or certain key identifiable language." *Campbell*, 168 F.3d at 266–67 (footnote omitted). However, "individual paragraphs and sentences must not be read out of context." *Id.* at 267.

**Remand order**

The parties look to different parts of the prior panel's decision to support their respective views of the mandate. The warden, like the district court, cites the finding of the prior panel that "Carter's twenty-eighth and twenty-ninth grounds for relief were fairly presented to the state courts and are not based on new or distinct theories insofar as they relate to the preparation of Carter's mitigation expert and the failure of Carter's mother to testify at his mitigation proceedings." *Carter*, 693 F.3d at 569. The warden also references a paragraph that apparently guided the district court to its narrow reading of the mandate:

> In his petition for habeas corpus to the federal district court, Carter's twenty-eighth ground for relief asserts that he was denied the effective assistance of counsel at the mitigation phase of his trial. The claim goes into some additional

detail about the deficiencies of Dr. Chiappone's testimony and how, in Carter's view, it was caused by his failure to perform a diligent inquiry into Carter's background.  Additionally, Carter also specifically raises as part of this ground for relief counsel's failure to have his mother testify.  Similarly, Carter's twenty-ninth ground for relief raises the issue of counsels' [sic] ineffectiveness leading to the exclusion of evidence from the mitigation stage and, specifically, the trial court's refusal to provide the jury with a transcript of Dr. Chiappone's testimony.  Therefore . . . we remand the matter to the district court for it to consider the merits of these claims in the first instance.

*Id.*  The confusion, or disagreement, may stem from the reference to the phrase "these claims," which in this context could plausibly be read to refer to the specific theories of ineffective assistance of trial counsel raised before the Ohio Supreme Court, or to Claims 28 and 29 as pled in the later federal habeas petition.  Focusing on the language in the prior opinion to the effect that "Carter's twenty-eighth and twenty-ninth grounds for relief were fairly presented to the state courts and are not based on new or distinct theories insofar as they relate to the preparation of Carter's mitigation expert and the failure of Carter's mother to testify," the district court ruled that "the facial breadth of these claims as pled in the Petition is narrowed by the Sixth Circuit's reading of what was fairly presented to the Ohio courts" and concluded that its own "decision on the remanded issues is limited to those claims the Sixth Circuit found were fairly presented to the state courts." (R. 163, Post-Remand Report and Recommendation at Page ID 560, 561).

However, the district court overlooked other parts of the opinion that suggested otherwise.  When the panel summarized the full effect of its decision—in other words, what it was remanding—it suggested that it was sending back Claims 28 and 29 in full.  In the introductory paragraph to the section of the opinion on the ineffective assistance of trial counsel claims, it wrote:

Carter properly preserved the claims based on ineffective assistance of trial counsel during the mitigation stage raised in his twenty-eighth and twenty-ninth grounds for relief.  Therefore, we remand for the district court to determine in the first instance whether Carter is entitled to the writ based on his counsel's performance at the mitigation stage of the proceedings.

*Carter*, 693 F.3d at 563.  The concluding section of the opinion described its holding in the context of a remand order to the district court:

Carter did not procedurally default his twenty-eighth or twenty-ninth grounds for relief. Therefore, we . . . **REMAND** for the district court to consider whether Carter is entitled to a writ of habeas corpus based on counsel's performance at the penalty phase of trial or the trial court's exclusion of evidence at the mitigation phase.

*Id.* at 569. This summation of the holding is clear enough: because neither Claim 28 nor 29 for habeas relief had been procedurally defaulted, the prior panel ruled that the district court was to consider the merits of both claims on remand. Moreover, this section contains no qualifying language regarding its remand of Claims 28 and 29, as might be expected if only portions of those claims were being remanded.[1] Thus, Carter is correct that the district court erroneously narrowed the mandate of the prior decision.

## II. Stay-and-abey order

## Standard of review

We review for abuse of discretion a district court's denial of a stay of federal habeas proceedings. *Ryan v. Gonzales*, 133 S. Ct. 696, 708 (2013).

## Whether Carter may stay and abey federal habeas proceedings

Having been denied relief in the district court based on the district court's narrow reading of the remand order, Carter seeks to pursue further proceedings. He is principally interested in returning to state court, rather than a remand to the district court for consideration of Claims 28 and 29 (as previously remanded) on the existing record.

Carter first raised the possibility of returning to state court to present additional evidence in 2013 after the magistrate judge, on remand, ruled that *Cullen v. Pinholster*, 563 U.S. 170 (2011), barred the district court from considering additional evidence developed in federal

---

[1]The decision also made clear that Claims 28 and 29 had been exhausted:

Carter did not need to, nor attempt to, preserve grounds twenty-eight or twenty-nine through his Rule 26(B) application. These claims had already been squarely presented to the state courts through one complete round of the State's established appellate review process. Therefore, the claims had been exhausted and were suitable for review by the federal district court when Carter filed his petition for a writ of habeas corpus.

*Id.* at 566.

habeas proceedings. In the eighteen years since filing his habeas petition, Carter has added to the district court record what he describes as "a veritable mountain of new mitigation evidence" that was never before any state court, and therefore moved to stay the federal proceedings while he introduced the evidence in Ohio courts. (Pet.'s Br. at 45.) The district court denied a stay, ruling that the Supreme Court had not allowed stays for "unexhausted evidence," only for unexhausted claims.[2]

*Pinholster* indeed limited the "record under review" in federal habeas proceedings to "the record before the state court," precluding review of evidence developed in federal habeas proceedings. 563 U.S. at 182; *accord Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012) ("even if a petitioner was granted an evidentiary hearing pursuant to § 2254(e), the federal court must disregard newly obtained evidence that supports a claim that was previously adjudicated on the merits before the state court") (footnote omitted). Carter concedes that the evidence added to the federal court record but never before any state court cannot be considered in habeas proceedings. Nevertheless, in an effort to evade *Pinholster*, Carter seeks to return to state court so that he can change the record before it and, hopefully, recommence federal habeas proceedings with a more favorable state court record. The question before us is whether he is entitled to a stay for this purpose, and whether the district court abused its discretion in denying him one.

As he did below, Carter looks to *Rhines v. Weber*, 544 U.S. 269 (2005), to persuade this Court that the district court abused its discretion in denying a motion to stay the habeas proceedings in the district court and hold them in abeyance while he presents an expanded body of evidence in state court in support of Claims 28 and 29 of his federal habeas petition. The district court was correct that *Rhines* concerned the availability of a stay for so-called "mixed" petitions in which some claims had been exhausted in state courts and some had not; the word "evidence" does not appear anywhere in *Rhines*. *Id.*

In *Rhines*, the petitioner had filed an amended habeas petition asserting some thirty-five grounds for relief. *Id.* at 272. Eighteen months after the petition was filed, the district court found eight of those claims not to have been exhausted, at which point the 1-year AEDPA statute

---

[2]The district court also found that the issues for which Carter sought a stay exceeded the scope of the mandate, as it erroneously read the remand order.

of limitations had run. *Id.* Prior to AEDPA's enactment, and the enactment of its 1-year statute of limitations, the solution would have been simple: the district court would dismiss the petition, "leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court"—with plenty of time to do so. *Rose v. Lundy*, 455 U.S. 509, 510 (1982) (requiring exhaustion of all claims). Because the AEDPA statute of limitations had lapsed during the pendency of the district court proceedings in *Rhines*, the option of refiling with only exhausted claims was foreclosed. 544 U.S. at 272–73.

The question remained as to whether, post-AEDPA, a petitioner could return to state court to exhaust claims. The Supreme Court recognized that "[a]s a result of the interplay between AEDPA's 1-year statute of limitations and *Lundy*'s dismissal requirement, petitioners who come to federal court with 'mixed' petitions run the risk of forever losing their opportunity for any federal review of their unexhausted claims." *Rhines*, 544 U.S. at 275. Thus, *Rhines* held that district courts could stay federal habeas proceedings and hold them in abeyance in the exercise of their discretion while a petitioner returned to state court, but cautioned that "stay and abeyance should be available only in limited circumstances" because "[s]tay and abeyance, if employed too frequently, has the potential to undermine" AEDPA's purpose of finality and its requirement that petitioners first seek relief in state courts. *Id.* at 277. It elaborated on the standards for issuing a stay:

> Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Id.* Were a petitioner to meet these standards, a district court should grant a stay:

> [I]t likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics. In such circumstances, the district court should stay, rather than dismiss, the mixed petition.

*Id.* at 278.[3]

Carter argues that not only has he met these standards, but *Rhines* permits stays for a petitioner to "exhaust evidence"—in other words, to return to state court to submit additional evidence to buttress claims already exhausted, as the prior panel ruled Claims 28 and 29 were. (Pet.'s Br. at 29.)  For the most part, the mitigating evidence Carter deems most relevant is contained in the Wantuck reports, which were prepared in 1992 in anticipation of the sentencing phase of the trial, but were never actually made part of any state court record.  Thus, whether or not this evidence might constitute a "mountain," it is certainly not new.

Carter seeks to use *Rhines* as an end-run around *Pinholster*, with the added benefit that a return to state court might delay his impending death sentence for a substantial period.  In addition to arguing that he had no reason to return to state court prior to *Pinholster*, he principally relies on *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011), a post-*Pinholster* case concerning a potential *Brady* violation that was only discovered during the course of federal habeas proceedings.[4]  The dissent in *Pinholster* had posited that potential exculpatory evidence discovered in federal habeas proceedings could constitute a new claim outside the bar to new evidence announced by the majority, and the majority left open the possibility that this could constitute a new claim.  563 U.S. at 186 n.10.  *Gonzalez* took up this possibility—and took advantage of the lack of clarity as to what constituted new claims—and ordered the district court to stay the petitioner's *Brady* claim while he presented the withheld evidence to state courts.

---

[3]The warden also relies on *Ryan v. Gonzales*, 133 S. Ct. 696 (2013), in which the Supreme Court found no stay warranted where the petitioners sought a stay of federal habeas proceedings while they were incompetent and one petitioner's claims could be adjudicated on the record alone.  With respect to the other petitioner's claims, "even if [the petitioner] could show that [his final] claim was both unexhausted and not procedurally defaulted, an indefinite stay would be inappropriate" because "AEDPA's acknowledged purpose is to reduc[e] delays in the execution of state and federal criminal sentences." *Id.* at 709 (internal quotations and footnote omitted).  *Gonzales* reiterated *Rhines*' concern about the potential for stays to undermine finality, especially in capital cases.  "In particular, capital petitioners might deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death. Without time limits [on stays], petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review." *Id.* (quoting *Rhines*, 544 U.S. at 277–78).

[4]Carter also derives support for his request for a stay from *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), which, he claims, "supports allowing a post-judgment stay to exhaust not only claims but newly developed evidence in support of existing claims." (Pet.'s Br. at 37.)  *Trevino* concerned a petitioner who had not included a claim for ineffective assistance of trial counsel at sentencing on direct appeal, and whose initial post-conviction counsel did not include a claim for inadequate investigation and presentation of mitigating evidence.  Because this case does not concern the performance of state post-conviction counsel, *Trevino* is not instructive. *Id.*

667 F.3d at 980. *Gonzalez* not only does not apply in this Circuit but is altogether distinguishable; whereas in that case, the exculpatory evidence was in the prosecutor's possession, Carter simply neglected to submit relevant documents to the jury or attach much additional information to his post-conviction petition.[5]

Carter's brief goes on at length about how trial counsel could have made better use of the information contained in the Wantuck reports, but makes no allegation whatsoever that this evidence was unavailable to Carter's counsel on direct appeal or in state post-conviction proceedings. The belated expansion of the federal court record to include Attorney Haas' file suggests that trial counsel may not have given appellate counsel the full file, which included the Wantuck reports. From the trial transcript, Dr. Chiappone appears to have been a less than engaging speaker; although the Wantuck reports may show that Dr. Chiappone or another witness might have given a somewhat more compelling presentation, that does not by itself allow us to extend *Rhines* stays to encompass "unexhausted evidence," and does not entitle Carter to a trip back to state court. Moreover, we are aware of AEDPA's purpose of achieving finality, and must keep that interest in mind when deciding the propriety of a stay. *See Gonzales*, 133 S. Ct. at 709; *Rhines*, 544 U.S. at 277–78. Allowing a petitioner periodically to discover (or rediscover) information about himself would frustrate that goal, and could incentivize capital defendants to "deliberately engage in dilatory tactics to prolong their incarceration and avoid execution of the sentence of death." *Rhines*, 544 U.S. at 277–78. Accordingly, the district court did not abuse its discretion in denying a stay.

## III. Merits of Carter's claims

### Standard of Review

"On appeal of a denial or grant of a petition for a writ of habeas corpus, this Court reviews the district court's conclusions of law *de novo* and its factual findings for clear error." *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). Where a state court adjudicates a claim on the merits, AEDPA allows habeas relief only in limited circumstances:

---

[5]Carter also relies on *Cunningham v. Hudson*, 756 F.3d 477 (6th Cir. 2014), in which we remanded to the district court to determine whether stay-and-abeyance was appropriate where a petitioner had failed to exhaust his claims. However, the prior panel found that Claims 28 and 29 had been exhausted.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254. The decision of a state court is contrary to clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court unreasonably applies clearly established federal law "if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014). An incorrect or erroneous application of clearly established federal law is not the same as an unreasonable one; "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *Id.* at 1706–07 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). AEDPA deference applies under § 2254(d) even when a state court does not explain the reasoning behind its denial of relief. *Richter*, 562 U.S. at 99. Federal courts "measure state-court decisions against [Supreme Court] precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) (quoting *Pinholster*, 563 U.S. at 182).

Ineffective assistance of counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a twofold showing: "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. *Strickland* proclaimed that "[j]udicial scrutiny

of counsel's performance must be highly deferential." *Id.* at 689. Because § 2254(d)(1) of AEDPA limits the circumstances in which federal courts may grant a writ of habeas corpus, the Supreme Court has described habeas review of state court adjudications of ineffective assistance of counsel claims as "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

## A. Basis of Carter's ineffective assistance of counsel claims

Carter has not shown that the district court abused its discretion in denying a stay. Although Claims 28 and 29 were remanded in full, Carter concedes in his brief that only portions of these claims were presented to the Ohio courts on direct appeal and in post-conviction proceedings. Unfortunately for Carter, the only course of action consistent with the prior panel's ruling that "Carter properly raised his claims based on ineffective assistance of trial counsel at the penalty phase in both his direct appeal and state collateral proceedings, and the district court erred by concluding otherwise," *Carter*, 693 F.3d at 563, is to consider both claims decided on the merits by the state courts, entitling the state courts to "deference" under 28 U.S.C. § 2254(d)(1). *Richter*, 562 U.S. at 99 (holding that even unexplained state court decisions are entitled to deference under § 2254(d)(1)). Although the Ohio courts explained their rulings on the merits with respect to the three theories addressed by the district court, the state court decisions denying relief do not show any consideration of any of the other alleged errors Carter's trial counsel allegedly made at sentencing. As discussed, *Pinholster* bars federal courts from considering any of the evidence Carter has developed in any potential future proceedings in federal court. Remanding Claims 28 and 29 for full consideration by the district court would be a fruitless exercise and a waste of judicial resources where there is simply no admissible evidence that Carter could marshal to surmount AEDPA's high bar. We will consider the merits of the theories addressed by the court below.

### 1. Eliciting negative testimony from Dr. Chiappone

To the extent that Carter attempts to relitigate the merits of his ineffective assistance of trial counsel claims, some additional background is necessary. For some two months prior to the sentencing phase, Carter's counsel had been working with Dr. David Chiappone, a psychologist with the Hamilton County court clinic, whom counsel had selected as a mitigation expert and

who had then been appointed by the court. By the time of the mitigation hearing itself, the pre-trial psychological evaluations, which contained the information about Carter's cruelty to animals, abuse of girlfriends, and obsession with guns, had long since been sent to the prosecution. Before asking any substantive questions, counsel made clear that he had asked Chiappone to give a balanced view of Carter's history:

> Q. [B]efore we get started . . . some or many of the things that you are going to tell the jurors are negative towards Cedric Carter; is that correct?
>
> A. Yes.
>
> Q. But you promised that you will give the total picture when it's helpful or hurtful to Cedric Carter's position?
>
> A. Yes.
>
> Q. And that is always the way you are; is that correct?
>
> A. That is the way we prefer to present this information, yes.
>
> Q. And that is what our request has been; is that correct?
>
> A. Yes, sir, that is correct.

(J.A. vol. 6, p. 2143.)

Dr. Chiappone began his presentation by testifying about Carter's family history, including his biological father's rejection of him and his "strained relationship" with his mother, who had apparently abused him as a child. (*Id.* at 2146.) Carter's mother apparently "hit him with a belt if he was bad" and gave him "whippings." (*Id.*) She "encouraged [Carter] to fight with peers when he was having problems with them to the point that she would threaten him with a whipping if he would not fight." (*Id.* at 2147.) According to Dr. Chiappone, Carter's mother reported "numerous physical problems, psychiatric treatment." (*Id.*)

Trial counsel then asked about Carter's history of violent behavior:

> Q. Dr. Chapone [sic], I know much of this is not going to be positive towards Cedric but we have asked to you [sic] give the total picture to the jurors and we would like you to discuss his history of violence as you know it.
>
> A. It's my understanding in talking to Cedric that he denies ever using a weapon before towards another human, although he used a BB gun when he was a youngster. He denies ever using a knife or cutting anyone. I understand he has had an adult prior record of resisting arrest and disorderly conduct.

Q. That information – you saw the information that was provided to me by the prosecutors and that is the source of that information you are telling us now?

A. That is correct.

Q. Okay.

A. Also as a youngster he was into burning animals. He would shoot BB gun [sic] at animals and hurt them. He would use firecrackers to hurt animals. He would throw animals. He would throw them in front of trains. He says he killed probably four different animals. He had difficulty controlling his anger and it came out even towards animals. It's our understanding he has been physically abusive towards others: Mother claiming that Cedric would hit women that he would date, and it is our understanding also that he would beat up people on the street especially in this past year or so when he was using drugs. He was described as a bully and fighting with others.

(*Id.* at 2152–54.) Counsel later asked Dr. Chiappone at length about Carter's use of drugs, to which he was introduced by his sister's boyfriend at the age of 13. Counsel's decision to elicit the negative testimony from Dr. Chiappone appears tactical; in light of the information already in the hands of the prosecution, trial counsel could conceivably have thought that eliciting negative information on direct examination in the context of other, more favorable information about Carter would be less damaging than having the information come out on cross-examination.

### 2. Failing to call Carter's mother to testify

At oral argument, Carter's habeas counsel asked this Court for an opportunity to present Carter's "trauma narrative." A core part of the trauma narrative that was presented at the sentencing phase was Carter's childhood abuse at the hands of his mother, with whom he apparently had a "love/hate relationship," according to Dr. Chiappone. (J.A. vol. 6, p. 2147.)

Citing 1989 ABA professional guidelines for representation in capital cases, Carter argues to this Court that trial counsel's failure to call his mother fell so short of professional norms as to violate his right to the effective assistance of counsel. ABA Guideline 11.8.3 states that counsel "should consider" presenting "[w]itnesses familiar with and evidence relating to the client's life and development, from birth to the time of sentencing, who would be favorable to the client, explicative of the offense(s) for which the client is being sentenced, or would

contravene evidence presented by the prosecutor."**[6]** The 1989 ABA guidelines also state that, at sentencing, defense counsel "should consider presenting" certain topics including "[f]amily, and social history (including physical, sexual or emotional abuse, neighborhood surroundings and peer influence)."**[7]** Carter would have us constitutionally require his counsel to call the perpetrator of his child abuse, potentially undermining his own argument about the role abuse played in his development. Such an argument cannot be squared with the permissive language of the guideline, which stipulates only that defense counsel "should consider" calling witnesses who have known the defendant since birth, much less with counsel's traditional "discretion over deciding which witnesses to call and how to examine them." *Frazier v. Jenkins*, 770 F.3d 485, 504 (6th Cir. 2014) (citing *Gonzalez v. United States*, 553 U.S. 242, 249 (2008)).

Moreover, it came out at trial that Carter's mother had kicked him out of her house not long before the murder—and Carter only made the fateful trip to the UDF after he was unable to return to his mother's house on the evening of April 5, 1992 because the door was locked. Carter's mother had also disrupted court proceedings at a pre-trial hearing. Thus, trial counsel might have had good reason to consider calling Carter's mother as a mitigation witness a potentially risky or counterproductive move.

### 3. Transcript of Dr. Chiappone's testimony

The jury interrupted its deliberations after the sentencing phase to request a transcript of Dr. Chiappone's testimony. The trial court denied the request, stating:

> [O]ur policy is that the proceedings from which this testimony came . . . is a sentencing proceeding which was a relative [sic] short proceeding and, therefore, our policy is not to give you or reread testimony.
>
> The reason is it emphasizes – first of all, it was a short proceeding. It took place on Monday a short time ago and, secondly, it places an unfair emphasis to you on one part of the testimony as opposed to another.

---

**[6]** "1989 Guideline 11.8.3":

http://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/1989-guidelines/1989-guideline-11-8-3.html. Viewed July 11, 2016.

**[7]** "1989 Guideline 11.8.6":

http://www.americanbar.org/groups/committees/death_penalty_representation/resources/aba_guidelines/1989-guidelines/1989-guideline-11-8-6.html  Viewed July 11, 2016.

So for that reason I will not reread the testimony.

(J.A. vol. 6, p. 2275–76.)  Trial counsel did not object.[8]

After the prior panel remanded the case, the magistrate judge issued a report and recommendation recommending that Carter be denied relief on all three claims it considered remanded.  Carter filed objections to the report, in which he briefly mentioned the transcript request in the context of the claim regarding his mother, but did not object to the magistrate judge's finding that he was not entitled to relief on his claim regarding the denial of the transcript.  With respect to the transcript claim, the supplemental report and recommendation subsequently prepared by the magistrate judge stated only that Carter had made no objection regarding the recommended disposition of the claim in the previous report.  In his objections to the second report, Carter repeated the passing reference to the transcript in the context of the claim regarding his mother's failure to testify.  Both reports had included a notice at the end instructing the parties to serve and file specific, written objections.

In general, "the failure to file specific objections to a magistrate's report constitutes a waiver of those objections." *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).  However, the requirement of filing specific objections is not jurisdictional, and we sometimes excuse waiver "in the interests of justice." *Henson v. Warden, London Corr. Inst.*, 620 F. App'x 417, 420 (6th Cir. 2015) (quoting *Thomas v. Arn*, 474 U.S. 140, 155 (1985)) (declining to excuse waiver).  In a few limited circumstances, we have been willing to excuse the waiver of an issue:

> (1) if the case is "exceptional" and declining to review the issue would "produce a plain miscarriage of justice"; (2) if hearing the issue "would serve an overarching purpose other than simply reaching the correct result in this case"; and (3) if the issue is presented with sufficient clarity such that no factual development would be required and resolving the issue would promote the finality of litigation in the case.

*Henson*, 620 F. App'x at 420 (quoting *In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001)).  None of these narrow exceptions applies to this case, and Carter does not attempt to refute the warden's

---

[8]On direct appeal and in his state post-conviction petition, Carter framed this issue as one of trial court error, not ineffective assistance of counsel.  Only in federal habeas proceedings did Carter allege ineffective assistance of trial counsel for failing to ensure that the jury received a transcript.  However, this does not matter because Carter has waived this claim.

arguments that this claim has been waived. Thus, we consider Carter to have waived Claim 29, and decline to reach its merits.

**B. Whether the Ohio courts unreasonably applied federal law**

The effectiveness of Carter's trial counsel is not precisely the question before the court today; instead, where a state court addresses the merits of a claim, the inquiry of a federal habeas court centers on whether that state court decision was contrary to or unreasonably applied federal law as determined by the Supreme Court; only in those circumstances may a federal court grant habeas relief. *See* 28 U.S.C. § 2254(d)(1). The applicable provision of AEDPA, section 2254(d), "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (Stevens, J., concurring in judgment)). The Supreme Court has held that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles*, 556 U.S. at 124 (quoting *Strickland*, 466 U.S. at 690).

Both the Ohio Court of Appeals and the Ohio Supreme Court addressed Carter's two unwaived ineffective assistance of counsel theories that were most recently taken up by the district court on remand. On direct appeal, the Ohio Supreme Court ruled as follows:

## IX

### Ineffective Assistance of Counsel

The standard by which we review claims of ineffective assistance of counsel is well established. Pursuant to *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, *in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial would have been different. Accord State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373; *State v. Combs, supra*. Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be

considered sound trial strategy. *Strickland* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–695; *State v. Wickline* (1990), 50 Ohio St.3d 114, 126, 552 N.E.2d 913, 925. *Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of a trial was unreliable or the proceeding fundamentally unfair because of the performance of trial counsel. Lockhart v. Fretwell* (1993), 506 U.S. 364, ——, 113 S.Ct. 838, 842–843, 122 L.Ed.2d 180, 189–191.

Carter claims that ineffective assistance of his trial counsel is demonstrated by (1) counsel's failure to file a Crim. R. 13 motion to consolidate his trial with that of Hill and Sims, and to subpoena Hill to testify; (2) counsel's failure to obtain a firearms expert to provide testimony reinforcing Carter's contention that he lacked intent to kill; (3) counsel's presentation of a clinical psychologist during the mitigation hearing whose testimony was mixed in nature and included recitation of facts prejudicial to Carter; and (4) counsel's failure to call Carter's mother to testify during the mitigation hearing. *None of these alleged deficiencies rises to the level of prejudicial deficient performance, nor otherwise meets the ineffective assistance of counsel criteria set forth above.*

*Carter*, 651 N.E.2d at 977 (emphases added). The Ohio Supreme Court's decision addressed the merits of Carter's ineffective assistance claims, thus triggering AEDPA deference under § 2254(d)(1). *Richter*, 562 U.S. at 98. In its opinion, the Ohio Supreme Court correctly identified *Strickland*, which established the prevailing doctrine regarding ineffective assistance of counsel, as the correct legal standard to be applied to ineffective assistance of counsel claims. *See Bell v. Cone*, 535 U.S. 685, 698 (2002) (state court correctly identified *Strickland* as standard applicable to ineffective assistance of counsel claims).

Thus, to be entitled to relief, Carter must persuade this Court that the Ohio Supreme Court unreasonably applied *Strickland* to his claims that counsel was ineffective for "present[ing] a clinical psychologist during the mitigation hearing whose testimony was mixed in nature and included recitation of facts prejudicial to Carter" and "failing to call Carter's mother to testify during the mitigation hearing." *Carter*, 651 N.E.2d at 977. Carter argues that the Ohio Supreme Court unreasonably applied *Lockhart v. Fretwell*, 506 U.S. 364 (1993), by "requiring a separate inquiry into fundamental fairness when reviewing the prejudice prong of the *Strickland* test." (Pet.'s Br. at 51.)

*Lockhart* concerned counsel's failure to object at sentencing where, under contemporaneous Eighth Circuit precedent, "a death sentence [was] unconstitutional if it [was]

based on an aggravating factor that duplicates an element of the underlying felony." 506 U.S. at 367. By the time federal habeas proceedings commenced, however, the Eighth Circuit had reversed its rule in light of contrary Supreme Court precedent. *Id.* at 368. Quoting liberally from statements in *Strickland* to the effect that a defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," the Supreme Court denied relief. *Id.* at 369 (quoting *Strickland*, 466 U.S. at 687). The Court reasoned that "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Id.* at 369-70. The opinion continued:

> We adopted the rule of contemporary assessment of counsel's conduct because a more rigid requirement could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client. But the "prejudice" component of the Strickland test does not implicate these concerns. It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.

*Id.* at 372 (internal quotations and citations omitted).

Carter directs this Court's attention to *Williams v. Taylor*, 529 U.S. 362 (2000), in which the Supreme Court held that the Virginia Supreme Court had unreasonably applied *Lockhart v. Fretwell* by requiring a separate inquiry into fundamental fairness "even when Williams [was] able to show that his lawyer was ineffective and that his ineffectiveness probably affected the outcome of the proceeding." *Id.* at 393. In *Williams*, the Virginia Supreme Court had ruled that

> [t]he prisoner argues there "is a 'reasonable probability' that at least one juror would have been moved to spare Petitioner's life had he heard' the mitigation evidence developed at the habeas hearing that was not presented at the trial. Summarizing, he contends there "is a 'reasonable probability' that had at least one juror heard *any* of this evidence—let alone all of this evidence—the outcome of this case would have been different."

> We reject these contentions. The prisoner's discussion flies in the face of the Supreme Court's admonition in *Lockhart, supra,* that "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."

*Id.* at 394 (quoting *Williams v. Warden*, 487 S.E.2d 194, 199 (Va. 1997)).

The cursory opinion of the Ohio Supreme Court in this case is much less clear as to whether the state court was requiring a separate fairness inquiry. The Ohio Supreme Court first correctly identified the dual requirements of deficient performance and prejudice under *Strickland* whereby prejudice consists of serious errors on the part of counsel raising "a reasonable probability that, in the absence of those errors, the result of the trial would have been different." *Carter*, 651 N.E.2d at 977. The opinion merely went on to quote various glosses on that standard, including *Lockhart*'s quotation of *Strickland* itself, regarding a fair trial and a reliable outcome—a defendant must show errors by trial counsel so grave as to raise the reasonable probability of a different result of the trial, i.e., that the outcome reached in the case cannot be said to be reliable. *See Strickland*, 466 U.S. at 694. AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotations and citations omitted). It would therefore be inappropriate to assume that the Ohio Supreme Court engaged in a separate fairness inquiry where it does not appear to have done so.

Carter also takes issue with the opinion of the Ohio Court of Appeals denying his post-conviction petition. Unlike the claim for deliberately eliciting negative testimony, the Ohio Court of Appeals addressed the merits of this claim in post-conviction proceedings because Carter had attached an affidavit from his mother to his state post-conviction petition. In her affidavit, Carter's mother testified to his low IQ and approval for Supplemental Security Income benefits based on his mental deficiencies, his school history and history of drug use, and her unsuccessful efforts to engage schools and law enforcement to get him to go to school and stop dealing drugs. When presented with the sole argument on appeal that the trial court erred in dismissing the post-conviction petition without an evidentiary hearing, the Ohio Court of Appeals denied relief:

> Nor are we persuaded by the challenge to defense counsel's performance predicated upon counsel's failure to call Carter's mother to testify during the penalty phase of the trial. In her affidavit, Carter's mother offered the substance of her testimony in mitigation had she been called to testify. The essence of her proposed testimony regarding Carter's developmental, educational, interpersonal, and substance-abuse problems was presented through Carter's unsworn statement and the testimony of the other mitigation witnesses. Thus, the evidentiary material offered in support of this aspect of Carter's ninth claim for relief does not raise a reasonable probability that, but for this omission of counsel, the result of the penalty phase of the trial would have been different.

*Carter*, 1997 WL 705487, at *7.

Carter argues that the Ohio Court of Appeals unreasonably applied Supreme Court precedent because "the issue is not whether counsel should have presented Carter's mother's testimony as part of the mitigation case" but rather whether the investigation supporting that decision was itself reasonable. (Pet.'s Br. at 55.) While Carter is correct that the duty to investigate was clearly established by this point, a review of the record shows that Carter's post-conviction counsel did not attack the investigation—which was more than sufficient to support trial counsel's decision not to call Carter's mother to testify. *See Strickland*, 466 U.S. at 690–91 (discussing counsel's duty to investigate in preparation for sentencing phase of capital trial). Rather, Carter argued only that trial counsel was ineffective for failing to call his mother to testify because she would have humanized her son in the eyes of the jury, and that the trial court should have granted an evidentiary hearing on this issue. The Ohio Court of Appeals, faced only with these narrow arguments, applied *Strickland*, as adopted in subsequent Ohio case law, to determine whether her proposed testimony would have made the difference between the death penalty and a lesser sentence. There was nothing unreasonable in its application of the *Strickland* standard.

Accordingly, we affirm the district court's denial of relief on Claims 28 and 29 in full.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the order of the district court denying Carter a writ of habeas corpus, and denying him a stay of the federal habeas proceedings.